Harold B. CALDER and Dorothy V. Calder, Plaintiffs–Appellants,

v.

CAMP GROVE STATE BANK, Defendant–Appellee.

No. 89–1832.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1989.

Decided Jan. 2, 1990.

D. Phillip Anderson (argued), Vonachen, Lawless, Trager & Slevin, Peoria, Ill., for defendant-appellee.

Barry M. Barash (argued), Barash, Stoerzbach & Henson, Galesburg, Ill., for plaintiffs-appellants.

Before CUMMINGS and FLAUM, Circuit Judges, and WILL, Senior District Judge.*

CUMMINGS, Circuit Judge.

This is an appeal from the United States District Court for the Central District of Illinois. The district court reversed the bankruptcy court's judgment that Harold Calder's $25,000 guaranty of the $75,000 debt of his son and daughter-in-law to the Camp Grove State Bank was released by a

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

later transaction with that bank. The district court held that the bankruptcy court improperly relied on parol evidence in finding that the guaranty was released. We agree with the district court and affirm.

## I. Factual Background

In September of 1983 John and Kathleen Calder established a $75,000 line of credit with the Camp Grove State Bank ("Camp Grove") located in Camp Grove, Illinois. The purpose of the loan was to provide working capital for John and Kathleen's farming operations on a farm owned by John's parents, Harold and Dorothy Calder. As security for the loan, Camp Grove required Harold to execute a guaranty in the amount of $25,000. He did so on September 28, 1983. This guaranty included the language, "The taking of other securities or endorsements shall in no way affect liability hereunder."

In July and August of 1984 the senior Calders agreed to sell their farm to John and Kathleen for $205,400. The $50,000 down payment for this transaction was provided by Camp Grove. Originally this loan was to have been to John and Kathleen, with the senior Calders as guarantors of the entire $50,000. That arrangement was altered, with the consent of all of the parties, to make the senior Calders additional co-makers of the loan. As security for this $50,000 note, Harold, Dorothy, John, and Kathleen gave Camp Grove a second mortgage on the farm (the first mortgage was held by another local bank), and Harold and Dorothy assigned to Camp Grove the remaining payments due them under the contract of sale [1] of the farm to John and Kathleen. Camp Grove's security was limited, however, by additional language in the assignment reciting that the assignment was "subject to and limited by the terms" of the contract of sale and that the senior Calders' liability was not extended beyond $50,000. Thus the terms of the contract of sale were included by reference in the security agreement (the assignment) between

Camp Grove and the senior Calders. Paragraph 21 of the contract of sale likewise limits the senior Calders' liability to the bank with the following language:

> The Sellers [the senior Calders] assign the proceeds of this Agreement to Camp Grove State Bank for purposes of satisfying the Fifty Thousand ($50,000.00) Dollar note in the event that the Buyer [the junior Calders] does not make the payments of principal and interest on said note when due. However, nothing contained herein shall be construed as to obligate the Sellers in any way to guarantee or be responsible for any other obligations of the Buyer to the Camp Grove State Bank or any other party. Nor shall the mortgage to be executed by the Sellers to the Camp Grove State Bank be perceived or construed as to allow the Camp Grove State Bank to impose on the Sellers by way of foreclosure any liability of the Buyers in excess of the $50,000.00 note which is being used as the down payment on this Agreement by the Buyers.

Neither the note, nor the assignment, nor the contract of sale refers to Harold Calder's $25,000 guaranty of the junior Calders' line of credit. These three documents pertaining to the sale of the farm were executed on August 1, 1984, and the sale of the farm and the $50,000 loan closed on August 2, 1984.

In December 1984 Camp Grove added $10,000 to John and Kathleen's $75,000 line of credit. At the same time, John and Kathleen further secured both this line of credit and the $50,000 promissory note by giving Camp Grove a "mortgage of equity" on the farm. The mortgage of equity gave Camp Grove a lien against John and Kathleen's equity position in the farm.

## II. Bankruptcy Court Proceedings

In 1985 John and Kathleen began to fall behind in their payments to Camp Grove,

---

**1.** The assignment refers to the contract of sale as the Agreement for Warranty Deed. The agreement itself is entitled, "Contract for Sale of

Real Estate." This opinion will refer to the agreement as the contract of sale.

and they filed for bankruptcy in 1986.[2] On January 15, 1988, Camp Grove sued the senior Calders in the Circuit Court of the Tenth Judicial Circuit of Illinois, to recover from them the $50,000 from the August 1, 1984 promissory note and the $25,000 from the September 28, 1983 guaranty. On February 8, 1988, Harold and Dorothy filed a bankruptcy petition under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of Illinois. This petition was accompanied by a Motion to Determine Nature and Extent of Claim, which sought a declaration that the $25,000 guaranty had been "subsumed and included in the new $50,000 obligation." This motion stayed Camp Grove's action in state court.

The bankruptcy court heard testimony on this matter on April 22, 1988. That testimony included statements by all four Calders that Mr. Dennis Hickey, Vice President of Camp Grove, had told them during a meeting in his office on August 1, 1984, one day before the farm sale closing, that the $25,000 guaranty would not continue in effect after the closing. Mr. Hickey testified that a preclosing meeting had occurred, but he denied making any references to the $25,000 guaranty. The bankruptcy court also admitted into evidence a letter from the senior Calders to Camp Grove in which they reviewed the terms of the August 1, 1984 promissory note and stated, "It is our understanding that our obligation to the Camp Grove State Bank extends only to the $50,000.00 note...." In addition, the bankruptcy court admitted into evidence Mr. Hickey's comment sheets in which he had recorded his various contacts with the Calders during the negotiations for the $50,000 loan. Mr. Hickey's July 30, 1984 entry in these comment sheets states in pertinent part: "[T]heir [the Calders'] concern is primarily with Harold and Dorothy not wanting to guarantee any more than the $50 M."

The bankruptcy court rendered an oral opinion on April 26, 1988, and instructed the Calders' counsel to prepare an order reflecting his findings. That order states in relevant part:

> The guaranty to Camp Grove State Bank signed by Harold B. Calder on September 28, 1983, was released on or about August 2, 1984, when John L. Calder, Kathleen O. Calder, Harold B. Calder and Dorothy Calder executed a promissory note in favor of the bank in the amount of $50,000.00....

### III. Appeal to the District Court

Camp Grove appealed to the United States District Court for the Central District of Illinois pursuant to 28 U.S.C. § 158(a). The district court concluded that "the bankruptcy court improperly relied on parol evidence in finding that Harold Calder's $25,000 guaranty was released." Order of March 17, 1989. That conclusion was correct.

### IV. Discussion

The Calders maintain that the bankruptcy judge's determination that the August 1984 promissory note released the September 1983 guaranty was a factual finding entitled to a clearly erroneous standard of review. They further maintain that the district court erred in upsetting this factual finding. It is true that reviewing courts must accept a bankruptcy court's factual findings unless they are clearly erroneous. *In re Excalibur Auto. Corp.*, 859 F.2d 454 (7th Cir.1988). A bankruptcy court's conclusions of law, however, are subject to *de novo* review. *In Re Longardner & Assocs., Inc.*, 855 F.2d 455, 459 (7th Cir.1988), certiorari denied, *Landahl, Brown & Weed, Assocs., Inc. v. Longardner & Assocs., Inc.*, —— U.S. ——, 109 S.Ct. 1130, 103 L.Ed.2d 191 (1989).

Under Illinois law,[3] the threshold question with respect to the admission of

---

**2.** John and Kathleen's plan under Chapter 11 of the Bankruptcy Code was approved by the United States Bankruptcy Court for the Central District of Illinois on October 28, 1987.

**3.** Both the September 1983 $25,000 guaranty and the three documents signed on August 1, 1984, were entered into in Illinois by parties who contemplated performance of these con-

parol evidence is whether the agreement being construed is fully integrated, that is, whether the agreement was intended by the parties to be a complete expression of their agreement. *Pecora v. Szabo,* 94 Ill. App.3d 57, 63, 49 Ill.Dec. 577, 581–582, 418 N.E.2d 431, 435–436 (1981). Where several instruments are executed together, they are to be treated and construed as a single instrument. *Id.* Thus the $50,000 note, the assignment, and the contract of sale that were all executed together on August 1, 1984, must be treated as a single instrument. The determination of whether a given instrument is fully integrated is a matter of law. *Id.* If the instrument is found to be fully integrated, then parol evidence is not admissible unless the instrument is ambiguous on its face.

> Where a written agreement is clear and explicit, a court must enforce the agreement as written. Both the meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids.

*Rakowski v. Lucente,* 104 Ill.2d 317, 323, 84 Ill.Dec. 654, 657, 472 N.E.2d 791, 794 (1984).

Neither the bankruptcy court nor the district court made an explicit finding with respect to whether the August 1984 agreements were fully integrated. Nevertheless, the district court correctly relied on *Johnson v. Flueckiger,* 81 Ill.App.3d 623, 624–625, 37 Ill.Dec. 224, 225–226, 401 N.E.2d 1317, 1318–1319 (1980), to conclude that a written instrument is "conclusively presumed to include all material terms." The August 1984 documents contained all of the terms of the sale of the farm. When asked at oral argument why the Calders did not include in the August 1984 documents their understanding that the August 1984 transaction would release them from the prior $25,000 guaranty, their counsel responded that they had forgotten about the $25,000 guaranty. If they had forgotten about the guaranty, it is difficult to credit their assertion that they intended

the August 1984 documents to release them from it.

Whether a contract is ambiguous is also a matter of law. *City of Clinton, Illinois v. Moffitt,* 812 F.2d 341 (7th Cir.1987). The bankruptcy court made no finding, and the Calders did not argue, that the terms of any of the August 1984 documents—the note, the assignment, and the contract of sale—were ambiguous. Nevertheless, the bankruptcy court admitted extrinsic evidence in the form of the Calders' testimony about the 1984 pre-closing meeting with Hickey, the Calders' letter to Camp Grove, and Hickey's comment sheets in an effort to determine the intent of the parties in signing the August 1984 note. The district court was entitled to review this decision by the bankruptcy court *de novo,* and the district court did not err in relying on *Rakowski* to determine that this parol evidence should have been excluded.

■ Having determined that the parol evidence was improperly admitted, it remained for the district court to determine whether the express terms of the 1984 documents—the note, the assignment, and the contract of sale—released Harold Calder from his earlier $25,000 guaranty. As previously noted, none of the August 1984 documents makes any reference to extinguishment of the September 1983 guaranty. The bankruptcy court reasoned that the language limiting the senior Calders' liability to $50,000 in the assignment and the contract of sale indicated that the senior Calders believed that they were to be released from the $25,000 guaranty.

The district court rejected this reasoning on three grounds. First, the court observed that the contract of sale and the assignment were prepared by the senior Calders' attorney and that if these documents were intended to release them from the $25,000 guaranty they should have expressed that intent explicitly. Second, the court correctly noted that even if the 1984 language as it stood expressed the senior Calders' intent to be absolved of their obligation under the $25,000 guaranty, neither

tracts in Illinois. Accordingly this dispute is governed by Illinois law.

the assignment nor the contract of sale expressed a concomitant intent on the part of Camp Grove to forgo its rights under the guaranty. Third, the court concluded that the true purpose of the liability-limiting language in the assignment and the contract of sale was not to achieve a release from the $25,000 guaranty, but rather to prevent the bank from acquiring a security interest in the proceeds of the sale of the farm ($205,400 total) beyond the $50,000 down payment on which the senior Calders were co-makers. Thus the district court reasoned that absent the liability-limiting language the senior Calders would have assigned not only $50,000 of the proceeds of the sale to Camp Grove but also the remaining $155,400 due them under the contract.

All three of these conclusions are correct. Furthermore, there is nothing in the August 1984 transaction—a sale of real estate from the senior Calders to the junior Calders—to suggest that it is related to Harold Calder's guaranty of the September 1983 working capital line of credit. In addition, as previously noted, the line of credit guaranty clearly states that "[t]he taking of other security or endorsements shall in no way affect liability hereunder."

The parties also disagree about whether the August 1984 documents should be analyzed as a release, a novation, or an accord and satisfaction, but it is a disagreement of no import. The bankruptcy court held that the August 1984 note constituted a release. The district court found that the bankruptcy court's analysis suggested a novation rather than a release, and the district court therefore analyzed the August 1984 transactions as a novation. In their brief in this appeal the Calders argue for the first time that the August 1984 transactions should be analyzed as an accord and satisfaction. This difference in the characterization of the August 1984 documents does not affect the outcome of this case, since, under Illinois law releases, novations, and accords and satisfactions are all contracts subject to the requirement of mutual intent and the constraints of the parol evidence rule. *Polo Nat'l Bank v. Lester*, 183 Ill.App.3d 411, 132 Ill.Dec. 220, 539 N.E.2d 783 (1989)

(parol evidence not admissible to construe release); *Ellis v. Conrad Seipp Brewing Co.*, 207 Ill. 291, 69 N.E. 808 (1904) (prior conversations not admissible to construe novation); *Brubaker v. United States*, 342 F.2d 655, 661 (7th Cir.1965) (applying Illinois law, accord and satisfaction subject to the same rules of construction as other contracts). Regardless of whether the August 1984 documents are viewed as an attempt to novate, release, or establish an accord and satisfaction with respect to the $25,000 guaranty, the district court did not err in declining to consider parol evidence offered to add a term to these fully integrated, unambiguous documents.

Finally, the Calders relied on the argument, below but not here, that Camp Grove's position was improved by the combined effect of the August 1984 transactions and the December 1984 mortgage of equity in which John and Kathleen gave the bank a lien against their equity in the farm. The district court was correct in not accepting this argument. Having concluded that the August 1984 agreements were not a substitute for the September 1983 guaranty, it makes no difference how those agreements—in conjunction with the later mortgage of equity—affected the bank's position.

## V. Conclusion

The bankruptcy court erred in admitting parol evidence to interpret the terms of the August 1984 documents. The judgment of the district court reversing the bankruptcy court is affirmed.